1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11 | LESLIE LARAY CRAWFORD,

12 |        Plaintiff,

13 |     v.

14 | CITY OF BAKERSFIELD, et al.,

15 |        Defendants.

Case No. 1:14-cv-01735-SAB

ORDER DENYING DEFENDANT CITY OF BAKERSFIELD AND DEFENDANT AARON STRINGER'S MOTION FOR SUMMARY JUDGMENT

(ECF Nos. 34, 36, 37)

16

17

## I.

18

## PROCEDURAL BACKGROUND

19       Plaintiff Leslie Laray Crawford filed this civil rights action pursuant to 42 U.S.C. § 1983

20 against Defendants City of Bakersfield and Aaron Stringer on November 6, 2014. (ECF No. 1.)

21 On May 27, 2015, Plaintiff filed a first amended complaint naming Michael Dozer as a

22 defendant in this action. (ECF No. 24.)

23       On June 29, 2016, Defendants City of Bakersfield and Aaron Stringer ("Defendants")

24 filed the instant motion for summary judgment. (ECF No. 34.) As part of the motion for

25 summary judgment, Defendants submitted a request for judicial notice.[1] (ECF No. 34-5.) On

26

27 ---

[1] Defendants request that the Court take judicial notice of the first amended complaint and answer to first amended complaint. The Court may consider the record in this matter, and therefore, the Court does consider the first amended complaint and answer to the first amended complaint in resolving the instant motion for summary judgment.

28

August 10, 2016, Plaintiff filed an opposition to Defendants' motion for summary judgment. (ECF No. 36.)  On August 17, 2016, Defendants filed a reply to Plaintiff's opposition to the motion for summary judgment.  (ECF No. 37.)

Oral argument on the motion was heard on August 24, 2016.  Brian Dunn appeared for Plaintiff.  Heather Cohen and Michael Marderosian appeared for Defendants.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the August 24, 2016 hearing, as well as the Court's file, the Court issues the following order.

## II.

## SUMMARY JUDGMENT LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment ... if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case..." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.

/ / /

/ / /

## III.

## UNDISPUTED MATERIAL FACTS

1.      On August 6, 2014, Elsa Torres drove to the TMP gas station located at 2140 E. Brundage Lane in Bakersfield, California in her 2003 Honda Accord.

2.      When Ms. Torres drove to the gas station, she was with her two minor children, Hilario and Manuel, her minor brother, Oscar, her minor nephew, Alonso, and her mother.

3.      Ms. Torres pulled into the gas station and parked next to a gas pump so she could get some gas.

4.      Ms. Torres got out of the car and inserted the pump into her vehicle gasoline filler tube, using the lever within the pumping apparatus to lock the pump into an activated position.

5.      As Ms. Torres was pumping gas, her four children were in the backseat of the car and her mother was in the front passenger seat.

6.      During this time, an African American man, later identified as Michael Dozer ("decedent"), approached Ms. Torres and her family and took the gas pump from Ms. Torres' vehicle, causing gas to get onto Ms. Torres, the ground and on himself.

7.      Decedent proceeded to use a lighter to start a fire.

8.      Decedent set himself and the ground on fire.

9.      The fire that decedent set at the gas station burned for approximately twenty-seven seconds and then went out.

10.      Ms. Torres believed decedent was trying to blow them up, killing everyone at the gas station.

11.      Angel Mora, who witnessed some of decedent's conduct, was also worried the whole gas station could blow up.

12.      Ms. Torres ran to her vehicle and pulled away from the pump.

13.      Witnesses to this incident, including Mr. Mora, called the police.

14.      The initial caller reported a black male subject threw gasoline on a female with a car load of kids.

15.     As Defendant Stringer was driving, he was advised by dispatch that the victim had been lit on fire.  Defendant Stringer was advised that "the female was set on fire, she put it out then fled."

16.     Defendant Stringer was advised by dispatch that the suspect was still at the scene and was believed to be located on the side of the gas station.

17.     Defendant Stringer had just finished assisting another officer with a felony warrant suspect when he saw a call pop up on his mobile data computer regarding this incident. A mobile data computer ("MDC") is a computer in a police vehicle which is used to dispatch calls  and provide officers with information.

18.     Defendant Stringer, who was by himself, arrived at the gas station.

19.     As Defendant Stringer arrived, he made contact with witnesses including Mr. Mora and Ms. Torres.

20.     Ms. Torres was upset and crying when she talked to Defendant Stringer.

21.     Mr. Mora and Ms. Torres told Defendant Stringer that they were okay.

22.     Defendant Stringer asked who decedent had tried to burn and Ms. Torres responded "it was me."

23.     Defendant Stringer did not observe any burn injuries to Ms. Torres or other external signs of trauma resulting from fire on Ms. Torres's person.

24.     Defendant Stringer did not observe any injuries to Ms. Torres.

25.     Defendant Stringer did not observe any blood or bruising of any kind on Ms. Torres's person.

26.     Defendant Stringer did not observe anything that led him to believe that Ms. Torres had been set on fire at any point in time.

27.     Ms. Torres never told Defendant Stringer that she had been injured physically.

28.     As Defendant Stringer was talking to Ms. Torres, she and another witness who had seen what had occurred pointed to decedent, identifying him as the man who was responsible for this.

29.     Mr. Mora heard Ms. Torres tell Defendant Stringer that decedent was "right

4

there."

30.     Defendant Stringer observed decedent pacing back and forth.

31.     At the time that he first approached decedent, Defendant Stringer knew that Ms. Torres had not been set on fire at any point in time.

32.     Defendant Stringer did not have any information that decedent was suspected of having committed any crimes on any date other than the date of the incident.

33.     Defendant Stringer began approaching the area where decedent was with the intention of speaking to him; however, as soon as decedent saw Defendant Stringer, decedent began to say something.[2]

34.     Defendant Stringer did not think that decedent was suffering from any form of mental illness based on the aggression that decedent was exhibiting and based on Defendant Stringer's past experience.

35.     Based on decedent's conduct, Defendant Stringer believed decedent was under the influence of a drug like PCP, which makes people very agitated and angry.[3]

36.     Defendant Stringer felt that decedent was very angry and agitated.

37.     Witnesses who observed decedent also believed decedent was angry and was acting in an aggressive manner.

38.     Decedent then picked up a horseshoe shaped bicycle lock off the table and proceeded to move toward Defendant Stringer.

39.     Decedent was holding the bend of the U of the bicycle lock at the base so that the large part of the bicycle lock was outward.

40.     Initially, Defendant Stringer did not draw his weapon.

41.     However, decedent kept moving toward Defendant Stringer.

---

[2] The parties dispute the words that decedent said to Defendant Stringer.  Defendants proffer that Defendant Stringer could hear decedent challenging him, saying things like "you want to go, let's do this."  Stringer Depo. 36:17-37:6. Plaintiff proffers that decedent told Defendant Stringer to "stay back" and/or "stay down."  Mora Depo. 30:11-18, 31:2-5, 36:3-8.

[3] Plaintiff disputes Defendant's undisputed material facts number 7 and 8 to the extent that a reasonable police officer would have additionally believed that Mr. Dozer may have been suffering from some form of mental illness. (ECF No. 36-1 at 6-10.)  However, these undisputed facts states what Officer Stringer believed and not what a reasonable officer would have or should have believed.  Therefore, the Court finds that these facts are undisputed.

1   42.   Witnesses heard Defendant Stringer loudly, clearly, and firmly tell decedent to

2   "get on the ground," "stand down," or "stop, put the weapon down, and get down."

3   43.   Defendant Stringer's commands were audible, but decedent did not comply with

4   Defendant Stringer's commands.

5   44.   Rosalie Montiel heard Defendant Stringer tell decedent to stop, put the weapon

6   down, and get down.

7   45.   Mr. Mora heard Defendant Stringer tell decedent to "stand down."

8   46.   Ms. Torres heard Defendant Stringer tell decedent to get down on the ground

9   twice.

10   47.   Defendant Stringer backed away, but decedent continued moving toward

11   Defendant Stringer.

12   48.   Defendant Stringer had never met decedent prior to this incident and did not have

13   any information about him before this incident.

14   49.   When Defendant Stringer realized decedent was not going to stop, Defendant

15   Stringer drew his firearm, at which point decedent continued moving toward Defendant Stringer

16   with the bicycle lock in his hand.

17   50.   Defendant Stringer believed decedent was attempting to hit him with the bicycle

18   lock.

19   51.   Witnesses believed that decedent was trying to attack Defendant Stringer.

20   52.   Defendant Stringer fired his weapon one time.

21   53.   Decedent was walking towards Defendant Stringer when Defendant Stringer

22   fired.

23   54.   Decedent never swung the bicycle lock at Defendant Stringer.

24   55.   Decedent never struck Defendant Stringer or any other person with the bicycle

25   lock.

26   56.   Defendant Stringer testified that decedent was approximately six to eight feet

27   away from him when he fired his weapon.

28   57.   Mr. Mora testified that decedent was fifteen to twenty feet away from Defendant

Stringer when Defendant Stringer fired his weapon.

58.   Officer George Vasquez testified that decedent was five to ten feet away from Defendant Stringer when Defendant Stringer fired his weapon.

59.   Carlos Cabrera testified that decedent was approximately ten feet away from Defendant Stringer in the moments preceding the shooting.

60.   Defendant Stringer testified that he was backing away from decedent prior to and at the time that he fired his weapon at decedent, and estimates that he backed up three to four feet.

61.   Ms. Torres testified that Defendant Stringer was backing away from decedent at the time of the shooting.

62.   Mr. Mora testified that Defendant Stringer was not backing away from decedent at the time of the shooting.

63.   Officer Vasquez testified that Defendant Stringer was not backing away from decedent or otherwise in motion at the time of the shooting.

64.   There was nothing that would have prevented Defendant Stringer from backing away and/or continuing to back away from decedent.

65.   Defendant Stringer never lost his balance or fell backward during the incident.

66.   Defendant Stringer did not feel that using a taser was an option.  Defendant Stringer has seen people, including people who are under the influence of drugs, get tasered and not react to tasering.  Defendant Stringer believed that the taser would have taken longer to fire because it was carried on the opposite side of his body, he would have had to flip it on, bring it up, and level it.

67.   Defendant Stringer estimates that a minute to a minute and a half passed between the time that he parked his patrol vehicle at the TMP gas station and the time of the shooting.

68.   When Defendant Stringer arrived at the gas station, there was no crime in progress, and decedent was no longer near the gas pumps.

69.   Defendant Stringer did not wait for backup and did not formulate any kind of tactical plan before approaching decedent, walked into an open area that did not afford him any

cover, and confronted a suspect who was potentially mentally ill.

70.     At the time of the incident, Defendant Stringer had been a police officer for approximately ten years.

71.     Decedent suffered from schizophrenia, and had taken medication and received mental health treatment for that condition during his lifetime.

72.     Defendant Stringer did not give decedent any warning that he was going fire his weapon.

73.     Defendant Stringer attended a police academy and is POST-certified.

74.     Defendant Stringer is trained that deadly force should be used only when other means of control are unreasonable or have been exhausted.

75.     Defendant Stringer is trained that deadly force is intended to be a force option of last resort.

76.     Defendant Stringer has received training regarding the tactics which should be employed during police encounters with individuals who may be suffering from a mental illness.

77.     Defendant Stringer is trained that an individual who is suffering from a mental illness such as bipolar disorder or paranoid schizophrenia may exhibit symptoms which are similar to those that would be exhibited by a person who is under the influence of PCP.

78.     Officers responding to a crime or other incident are expected to look at the totality of the circumstances.

79.     During the incident, Defendant Stringer was equipped with a functioning X26 Taser that was capable of shooting probes and operating in a "drive stun" mode, pepper spray, and a baton.

## IV.

## DISCUSSION

This is a wrongful death action that has been brought by the surviving mother of decedent.  As a preliminary matter, the Court addresses Defendants' motion to strike the expert report of Scott DeFoe, which Plaintiff submitted in support of her opposition to the motion for summary judgment.  Defendants argue that Mr. DeFoe's report should be stricken as it is hearsay

1    because it is unsworn.  Hearsay is "a statement, other than one made by the declarant while

2    testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

3    Fed.R.Evid. 801(c).  In the absence of a procedural rule or statute, hearsay is inadmissible unless

4    it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay

5    exception under Rules 803, 804 or 807.  See Fed.R.Evid. 802; 30B Federal Practice &

6    Procedure: Evidence § 7031 at 279.  At the hearing, Plaintiff conceded that Defendants'

7    objection should be sustained for this motion.  Therefore, the Court sustains Defendants'

8    objection to Mr. De Foe's report, and the Court does not consider it in rendering a decision on

9    the instant motion for summary judgment.

10         **A.    Section 1983 Excessive Force Claim**

11        Plaintiff alleges her first cause of action for violation of decedent's civil rights based on

12   excessive force against Defendant Stringer only.  Defendant Stringer argues that he is entitled to

13   judgment as a matter of law on this cause of action because the facts clearly and unequivocally

14   demonstrate that the use of force was reasonable and necessary.  Plaintiff alleges that Defendant

15   Stringer shot decedent without provocation or cause.  Defendant Stringer contends that he used

16   reasonable force in the circumstances presented here.  (ECF No. 34.)  The issue here is whether

17   the use of deadly force was excessive under the circumstances.

18        The reasonableness inquiry in excessive force cases is whether the officer's actions were

19   " 'objectively reasonable' in light of the facts and circumstances confronting" him.  Smith v.

20   City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).  "The 'reasonableness' of a particular use of

21   force must be judged from the perspective of a reasonable officer on the scene, rather than with

22   the 20/20 vision of hindsight."  Wilkinson v. Torres, 610 F.3d 546, 550 (9th Cir. 2010) (quoting

23   Graham v. Conner, 490 U.S. 386, 396 (1989)).  "The calculus of reasonableness must embody

24   allowance for the fact that police officers are often forced to make split-second judgments—in

25   circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

26   necessary in a particular situation."  Graham, 490 U.S. at 397.  In determining whether

27   Defendant Stringer's actions were reasonable, the Court must consider the risk of bodily harm

28   that Defendant Stringer posed to decedent in light of the threat that he was trying to eliminate.

1    Scott v. Harris, 550 U.S. 372, 383 (2007).

2         The "relevant factors in the Fourth Amendment reasonableness inquiry include "[1] the

3    severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of

4    the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest

5    by flight." Smith, 394 F.3d at 701 (quoting Graham, 490 U.S. at 396). The Supreme Court has

6    held that where an officer has probable cause to believe that a suspect poses a threat of serious

7    physical harm, either to the officer or to others, it is not unconstitutionally unreasonable to use

8    deadly force. Tennessee v. Garner, 471 U.S. 1, 12 (1985). The mere existence of some factual

9    disputes between the parties will not defeat an otherwise properly supported motion for summary

10   judgment. See Scott v. Harris, 550 U.S. at 381. With the benefit of hindsight, the Court and the

11   parties can review surveillance videos and witness testimony to parse out what actually

12   happened. However, this armchair-quarterbacking is inappropriate under a Fourth Amendment

13   analysis. The Fourth Amendment requires the Court to stand in the shoes of a reasonable officer

14   on the scene. See Graham, 490 U.S. at 396. The Fourth Amendment requires police officers to

15   make objectively reasonable decisions; it does not require them to do nothing and hope for the

16   best. See Scott v. Harris, 550 U.S. at 385 ("We think the police need not have taken that chance

17   and hoped for the best."); Billington v. Smith, 292 F.3d 1177 (2002) ("Maybe [the officer] could

18   have hoped that [the decedent who had grabbed the officer's gun and tried to pry it away] simply

19   wanted to disarm him, not shoot him, but that would have been a gamble.")

20        The most important factor is whether the suspect poses a threat to the safety of the

21   officers or others. Smith, 394 F.3d at 702. Plaintiff argues that the facts in this case show that

22   Defendant Stringer shot a mentally ill man who was fifteen to twenty feet away from him and

23   was merely walking toward him while holding a bicycle lock off to the side of his body below

24   shoulder level. (ECF No. 36 at 18.) Plaintiff argues that there are genuine disputes of material

25   facts that prevent granting summary judgment, including whether decedent was running or

26   walking at Defendant Stringer at the time that decedent was shot, the distance between decedent

27   and Defendant Stringer at the time decedent was shot, and whether decedent was holding the

28   bicycle lock above shoulder height.

It is undisputed that as Defendant Stringer moved toward decedent, decedent picked up a horseshoe shaped bicycle lock off the table and proceeded to move toward Defendant Stringer. (UMF 38.)   In fact, decedent picked up the lock off of the table after Defendant Stringer approached him.  (UMF 38; Stringer Depo. 43:19-21.)  This is not a situation where the plaintiff or decedent already had the object in his hand prior to the officer approaching him.  It is also undisputed that decedent was holding the bend of the U of the bicycle lock at the base so that the large part of the bicycle lock was outward.  (UMF 39.)

The distance between Defendant Stringer and decedent at the time of the shooting is disputed.  Defendant Stringer testified that decedent was approximately six to eight feet away from him when he fired his weapon.  (UMF 56.)  Officer George Vasquez testified that decedent was five to ten feet away from Defendant Stringer when Defendant Stringer fired his weapon. (UMF 58.)   Carlos Cabrera testified that decedent was approximately ten feet away from Defendant Stringer in the moments preceding the shooting.  (UMF 59.)   However, Plaintiff argues that Defendant Stringer was 15 to 20 feet from decedent at the time of the shooting.  Mr. Mora testified that decedent was fifteen to twenty feet away from Defendant Stringer when Defendant Stringer fired his weapon.  (UMF 57.)  Therefore, viewing the facts in the light most favorable to Plaintiff, the Court evaluates the reasonableness of Defendant Stringer's use of deadly force with 15 to 20 feet between the decedent and Defendant Stringer at the time of the shooting.  Defendants argue that even if Defendant Stringer was 15 to 20 feet from decedent at the time of the shooting, this does not negate the reasonableness of his actions.

Defendants cite to Lal v. California, 746 F.3d 1112, 1117 (9th Cir. 2014), Estate of Serrano v. Trieu, 2016 WL 1089225 (N.D. Cal. March 21, 2016), and Willis v. County of Sacramento, 2016 WL 4210051 (E.D. Cal. Aug. 10, 2016) in support of their argument that Defendant Stringer's use of deadly force was reasonable.

In Lal, the decedent held a football-sized rock over his head as he advanced toward the officers before being shot a yard from the officers.  The officers reasonably believed that the decedent would throw the rock at them because the decedent had been involved in a high speed chase; he hit himself with a stone; and he had thrown rocks at them.  Lal, 746 F.3d at 117.  The

1    plaintiffs argued that officers should have retreated or defused the situation.  Id.  The Ninth

2    Circuit held that based on the circumstances in that case, including the fact that officers could not

3    have allowed decedent to proceed on foot onto the freeway or reenter the freeway in his truck,

4    plaintiffs' claims regarding retreating or defusing the situation are not factually or legally

5    persuasive.  Id.  The Ninth Circuit concluded that under the totality of the circumstances, the

6    officers objectively feared immediate serious physical harm and a reasonable officer could have

7    believed that decedent threatened him with immediate serious danger.  Id. at 1119.  The instant

8    case is distinguishable from Lal, because the decedent in the present case did not throw anything

9    at Defendant Stringer prior to being shot and, viewing the facts in the light most favorable to

10   Plaintiff, the lock was held below shoulder height.

11           In Serrano, the district court found that the decedent who had a knife posed a threat to the

12   deputy who shot her and that if he had waited to shoot the decedent until she was any closer

13   would have unjustifiably put his "life at risk by affording him too narrow a window in which to

14   react to her."  Serrano, 2016 WL 1089225, at *6.  However, Plaintiff argues that Serrano is

15   distinguishable because in Serrano the officer backed up 160 feet before shooting the decedent.

16   Id. at *3.  While the deputy had retreated from the decedent in that case, the court noted that

17   police officer do not have a duty to retreat.  Id. at *6 n.18.  After the deputy stopped retreating,

18   he was fifteen to twenty feet away from the decedent at the time he shot her.  Id. at 6.  The

19   Northern District found that there was no evidence that decedent was incapable of rapidly

20   closing the gap and that there was uncontradicted evidence that decedent could have traversed

21   the fifteen to twenty foot gap in less than two seconds.  Id.  The Northern District cited to several

22   cases where courts have found that knife-wielding persons within 21 feet pose an imminent

23   threat to officers.  However, in the present case, decedent was not holding a knife, but instead a

24   metal lock.  The present case is also distinguishable because there is a dispute about the speed

25   and manner that decedent was walking toward Defendant Stringer.

26           In Willis, the district court held that the undisputed facts supported that the officer had

27   probable cause to believe that plaintiff posed a significant threat of death or serious bodily injury

28   to a second officer.  Willis, 2016 WL 4210051, at *5.  It was undisputed that plaintiff picked up

1    a sledgehammer and was carrying it as he launched himself over the counter in a dark coffee
2    shop.  Id.  The court found that "[t]he fact that a previously unarmed [p]laintiff grabbed a
3    weapon in mid-flight would cause a reasonable officer to believe he intended to use that weapon
4    on his captor."  Id.  The plaintiff argued that he made no swinging or turning motions toward the
5    second officer with the sledgehammer; he dropped the sledgehammer before he was hit with the
6    first shot; and the second officer was nowhere near plaintiff at the time of the shooting.  Id.  The
7    court reviewed the surveillance video, and when viewing frames of the video in isolation, found
8    that it appeared that the second officer was far enough behind plaintiff to be out of range of a
9    swinging sledgehammer.  Id. at 6.  However, the court noted that that did not account for how
10   fast the events actually unfolded, and the fact that the second officer was racing to intercept
11   plaintiff at the time of the shooting and would have been put directly in harms' way.  Id.  The
12   court also found that plaintiff could have thrown the sledgehammer at the second officer causing
13   great, if not greater than, injuries resulting from being struck during the course of hand-to-hand
14   combat.  Willis, 2016 WL 4210051, at *6.  The court found that "the severity of [p]laintiff's
15   crime, the fact that he was actively trying to evade or resist arrest, and the likelihood that
16   [p]laintiff posed an extraordinarily immediate threat to [the second officer], who was poised to
17   intercept a sledgehammer-toting [p]laintiff at the front of the store within the next one or two
18   seconds, all supported [the officer's] decision to use deadly force to protect his colleague."  Id.

19           Plaintiff argues that decedent made no swinging motions with the bicycle lock and did
20   not attempt to hit Defendant Stringer with the bicycle lock.  However, the Fourth Amendment
21   does not require a decedent or plaintiff to wield a weapon in any particular manner before an
22   officer is entitled to protect a third party or himself.  The Fourth Amendment does not require
23   superhuman powers of perception on the part of the responding officer in circumstances like
24   these.  See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).  There is the very real possibility
25   that decedent could have tried to throw the weapon at Defendant Stringer.  While it is plausible
26   that the injuries resulting from being hit with a bicycle lock thrown from a short distance could
27   be great, if not greater than injuries resulting from being struck directly during the course of
28   hand-to-hand combat, there is a material dispute regarding the distance between decedent and

1   Defendant Stringer at the time that decedent was shot.  See Willis, 2016 WL 4210051, at *6.  If
2   Defendant Stringer was 20 feet from the decedent at the time he fired the shot, a reasonable jury
3   could find that Defendant Stringer could not have been injured from a bicycle lock being thrown
4   at him at that time.

5        A reasonable jury could also find that if decedent was walking "normally" with the lock
6   held at his side, and he was twenty feet from the officer, that there was no immediate threat of
7   serious bodily injury or death to Defendant Stringer.

8        The Court must also consider the "character of the offense" committed by the suspect in
9   determining whether the use of force was justified.  Glenn v. Washington, 673 F.3d 864, 874
10  (9th Cir. 2011).  In this instance, Defendant Stringer approached decedent to talk to him.  At the
11  time Defendant Stringer approached decedent, Defendant Stringer had received information that
12  decedent had lit a fire with gasoline at the gas station.[4]  Although, at the time decedent was shot
13  he was no longer at the gasoline pumps and was not actively starting any fires, there had only
14  been a short amount of time between decedent starting the fires and being shot and decedent was
15  still at the gas station.  The severity of the crimes involved in this instance weighs in favor of the
16  use of force, although the Court recognizes that decedent was no longer at the actual area of the
17  pumps at the time he was shot.

18       Plaintiff argues that Defendant Stringer did not give any warning to decedent before
19  firing his gun.  Although Defendant Stringer did not give decedent a warning that he would shoot
20  after he pulled out his gun, Defendant Stringer did order decedent to get on the ground and/or
21  drop the lock prior to pulling out his gun.  (UMFs 43-47.)  However, the fact that Defendant
22  Stringer did not have his gun pulled out or trained on decedent at the time he gave him
23  instructions to get on the ground and/or drop the lock, could have resulted in it being unclear
24  what the consequences of a failure to comply with the command were.  A jury could reasonably
25  find that it was feasible for Defendant Stringer to issue more fully stated warnings.

26       In deciding whether the use of force was reasonable, the Court can also consider the

27  _____

28  [4] Although initially Defendant Stringer was told by dispatch that Ms. Torres had been lit on fire by decedent, at the time he approached decedent, he believed that Ms. Torres had not been lit on fire.

availability of alternate methods of subduing a suspect.  Smith, 394 F.3d at 703.  "Officers 'need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable.' "  Glenn, 673 F.3d at 876 (quoting Henrich, 39 F.3d at 915).  Plaintiff argues that Defendant Stringer could have used a Taser instead of firing his gun.  Defendant Stringer testified that he did not feel that using a taser was an option, because he has seen people, including people who are under the influence of drugs, get tasered and not react to tasering.  (UMF 66.)  Defendant Stringer believed that the taser would have taken longer to fire because it was carried on the opposite side of his body, he would have had to flip it on, bring it up, and level it.  (UMF 66.)

When the Court considers the facts in the light most favorable to Plaintiff, there are genuine disputes as to the distance between Defendant Stringer and decedent at the time of the shooting, the speed and manner which decedent was approaching Defendant Stringer, and the position of the bike lock.  When the Court considers the totality of the circumstances presented here, a jury could find that Defendant Stringer's use of force was not reasonable. There is a material dispute as to whether deadly force was appropriate at the time Officer Stringer fired his weapon.   The Court finds that Defendants have failed to show that there are no questions of fact regarding whether Defendant Stringer used unreasonable force when he shot decedent, and he is not entitled to summary judgment on the excessive force claim.

### B.    Qualified Immunity on Excessive Force Claim

The parties disagree on whether Defendant Stringer is entitled to qualified immunity. Defendant Stringer contends that he is entitled to qualified immunity because his use of force was reasonable and his conduct did not violate clearly established constitutional rights.

The doctrine of qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (citations omitted).

1     To determine if an official is entitled to qualified immunity the court uses a two part
2  inquiry.  Saucier v. Katz, 533 U.S. 194, 200 (2001).  The court determines if the facts as alleged
3  state a violation of a constitutional right and if the right is clearly established so that a reasonable
4  official would have known that his conduct was unlawful.  Saucier, 533 U.S. at 200.  A district
5  court is "permitted to exercise their sound discretion in deciding which of the two prongs of the
6  qualified immunity analysis should be addressed first in light of the circumstances in the
7  particular case at hand."  Pearson, 555 U.S. at 236.  The inquiry as to whether the right was
8  clearly established is "solely a question of law for the judge."  Dunn v. Castro, 621 F.3d 1196,
9  1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't. 556 F.3d 1075, 1085 (9th
10  Cir. 2009)).

11     When confronted with the question of whether Defendant Stringer is entitled to qualified
12  immunity, the Court will first consider whether "[t]aken in the light most favorable to the party
13  asserting the injury, do the facts show the officer's conduct violated a constitutional right?"
14  Brousseau v. Haugen, 543 U.S. 194, 198 (2004).  As discussed above, there are genuine disputes
15  of material fact that exist to preclude a finding on summary adjudication that Defendant Stringer
16  did not violate the decedent's civil rights.  A reasonable trier of fact could find that Defendant
17  Stringer violated the Fourth Amendment if decedent did not pose an immediate threat to
18  Defendant Stringer and no threat to others.

19     Defendants argue that Defendant Stringer's conduct did not violate "clearly established"
20  law.  Qualified immunity shields an official from personal liability where he reasonably believes
21  that his conduct complies with the law.  Pearson, 555 U.S. at 244.  " 'Qualified immunity gives
22  government officials breathing room to make reasonable but mistaken judgments,' and 'protects
23  all but the plainly incompetent or those who knowingly violate the law.' "  Stanton v. Sims, 134
24  S.Ct. 3, 5 (2013) (citations omitted).  It is not required that there be a case directly on point
25  before concluding that the law is clearly established, "but existing precedent must have placed
26  the statutory or constitutional question beyond debate."  Id. (quoting Ashcroft v. al–Kidd, 131 S.
27  Ct. 2074, 2085 (2011).  To decide whether Defendants are entitled to qualified immunity, the
28  question is whether it was clearly established that Defendant Stringer would violate the Fourth

1    Amendment at the time he shot decedent.

2        The Supreme Court has repeatedly stated that "clearly established law" should not be

3    defined at a high level of generality. City and County of San Francisco, Calif. v. Sheehan, 135 S.

4    Ct. 1765 (2015). "The dispositive question is whether the violative nature of particular conduct

5    is clearly established." Mullenix v. Luna, ___ U.S. ____, 136 S. Ct. 305, 308 (2015) (internal

6    quotation marks and citations omitted). "This inquiry must be undertaken in light of the specific

7    context of the case, not as a broad general proposition." Id. (internal quotation marks and

8    citations omitted). "Such specificity is especially important in the Fourth Amendment context,

9    where the Court has recognized that [i]t is sometimes difficult for an officer to determine how

10   the relevant legal doctrine, here excessive force, will apply to the factual situation the officer

11   confronts." Id. (internal quotation marks and citations omitted).

12       Plaintiff argues that it is clearly established that "[w]here the suspect poses no immediate

13   threat to the officer and no threat to others, the harm resulting from failing to apprehend him

14   does not justify the use of deadly force to do so." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

15   Any unresolved issues of fact regarding the reasonableness of Defendant Stringer's use of deadly

16   force are also material to a proper determination of the reasonableness of Defendant Stringer's

17   belief in the legality of his actions. See Santos v. Gates, 287 F.3d 846, 855 n.12 (9th Cir. 2002)

18   (finding it premature to decide the qualified immunity issue "because whether the officers may

19   be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of

20   disputed facts and the inferences it draws therefrom") (internal cite omitted).    Therefore,

21   Defendant Stringer has not shown that he is entitled to immunity from liability under section

22   1983 for his use of deadly force, and therefore, he is not entitled to summary judgment on

23   Plaintiff's Fourth Amendment claim.

24       **C.    Plaintiff's State Law Claims**

25       Plaintiff's state law claims against both Defendant Stringer and Defendant City of

26   Bakersfield, who Plaintiff alleges is vicariously liable for Defendant Stringer's actions, rise and

27   fall with the Court's finding that Defendant Stringer's conduct was reasonable as a matter of law.

28   See Cal. Penal Code § 835a (officers entitled to privilege for use of reasonable force); Edson v.

<u>City of Anaheim</u>, 63 Cal. App. 4th 1269, 1272 (1998) (unreasonable force required to prove battery claim).  Accordingly, as Defendant Stringer is not entitled to judgment as a matter of law on the excessive force claim, Plaintiff's state law claims also remain.

**III.**

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant City of Bakersfield and Defendant Aaron Stringer's objection to Scott De Foe's report is sustained; and

2.  Defendant City of Bakersfield and Defendant Aaron Stringer's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated:   **August 31, 2016**

UNITED STATES MAGISTRATE JUDGE